UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ANGELA UNDERWOOD,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:15-cv-34
Barrett, J.
Litkovitz, M.J.

REPORT AND
RECOMMENDATION

Plaintiff Angela Underwood brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court on plaintiff's statement of errors (Doc. 10) and the Commissioner's response in opposition (Doc. 15).

## I. Procedural Background

Plaintiff filed her applications for DIB and SSI in November 2011,[1] alleging disability since June 9, 2011 due to schizophrenia and depression. These applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested a *de novo* hearing before administrative law judge ("ALJ") Edmund E. Giorgione. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing. On September 6, 2013, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

---

[1] Plaintiff previously filed for benefits on August 5, 2009. (Tr. 112). Plaintiff's earlier application was denied at all stages of the administrative process. (Tr. 62-78, 112).

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

2

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2012.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since June 9, 2011, the alleged disability onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: schizophrenia, anxiety, right knee pain, and right arm ulnar neuropathy. The [plaintiff]'s chronic obstructive pulmonary disease [("COPD")] is not a severe impairment (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the [plaintiff] has the residual functional capacity [("RFC")] to perform work at all exertional levels as defined in 20 CFR 404.1567(c) and 416.967(c) except the [plaintiff] can only occasionally push and pull with the right upper extremity, and can only occasionally operate right foot controls. Mentally, the [plaintiff] is limited to simple, routine, and repetitive tasks that require only occasional change and occasional interaction with the general public and coworkers.
>
> 6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

---

[2] Plaintiff's past relevant work was as a sewing machine operator, a light, skilled position, and a sales attendant, a light, unskilled position. (Tr. 24, 55-56).

3

> 7. The [plaintiff] was born [in] . . . 1971 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
>
> 8. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).
>
> 9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]
>
> 11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from June 9, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-26).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

---

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative medium occupations such as a laundry laborer (100 jobs regionally, 15,000 jobs in the state, 175,000 jobs nationally) and a stores laborer (500 jobs locally, 50,000 jobs in the state, 200,000 jobs nationally). The VE also testified that plaintiff could perform the light exertional job of a garment sorter (100 jobs locally, 44,000 jobs in the state, 120,000 jobs nationally). (Tr. 25, 58).

4

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that the ALJ's treatment of plaintiff's hernia and ulnar neuropathy is not supported by substantial evidence. (Doc. 10). The plaintiff contends that as a result, the hypothetical question that the ALJ posed to the VE was incomplete. (*Id.*).

### 1. Substantial evidence supports the ALJ's assessment of plaintiff's hernia

Plaintiff argues that the ALJ erred by failing to indicate whether he found plaintiff's hernia to be a severe impairment and to explain why it was not severe if he so determined. (Doc. 10 at 6-8). Plaintiff contends that because the state agency medical reviewers did not offer any medical opinions about the severity of the hernia, the ALJ improperly "played doctor" in assigning no lifting restrictions due to the hernia in his RFC determination. (*Id.* at 8-9). Plaintiff asserts that "[c]ommon sense dictates that even a small hernia would result in at least some

5

lifting restrictions." (*Id.* at 9). Plaintiff argues that because the ALJ's hypothetical to the VE did not include any lifting restrictions associated with the hernia, the VE's testimony does not constitute substantial evidence to support a denial of benefits. (*Id.* at 10).

The Commissioner responds that an ALJ does not need to correctly identify all of a claimant's severe impairments as long as the ALJ identifies at least one severe impairment and considers the functional limitations resulting from all impairments in the RFC determination. (Doc. 15 at 4-5, citing *Maziarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987)). The Commissioner argues that the ALJ properly considered the limitations caused by plaintiff's hernia because the medical records show that it was a "very small" hernia that "substantially improved" after plaintiff took medicine. (*Id.* at 5). The Commissioner further argues that although plaintiff went to the emergency room for umbilical hernia pain in June 2012, "she had no tenderness to palpation about the umbilicus, and there was no swelling or protruding for any type of hernia sac." (*Id.*). Additionally, the Commissioner contends that the ALJ properly considered the fact that plaintiff did not receive any ongoing care for her hernia, "suggesting that it did not cause significant problems." (*Id.*). The Commissioner argues that the ALJ was not "playing doctor" by noting that the record did not contain medical evidence that would support plaintiff's testimony that her hernia limited her to lifting ten pounds. (*Id.*). The Commissioner contends that because the medical evidence "was not unclear regarding Plaintiff's hernia," the ALJ's decision not to consult a medical expert was reasonable. (*Id.* at 6).

At step two of the five-step sequential evaluation process, the ALJ found that plaintiff has the severe impairments of schizophrenia, anxiety, right knee pain, and right arm ulnar neuropathy. (Tr. 14). The ALJ explicitly determined that plaintiff's COPD is not a severe impairment, but made no finding at all concerning whether plaintiff's hernia is a severe

6

impairment. (*See id.*). Nevertheless, the ALJ did discuss plaintiff's hernia in his explanation of plaintiff's RFC. Specifically, the ALJ noted plaintiff's testimony that she could not lift more than ten pounds because of her hernia. (Tr. 22, 46). In discounting that testimony, the ALJ cited the following medical evidence: (1) plaintiff's hernia was diagnosed as "very small" in April 2012; (2) her condition "substantially improved" after receiving medication; (3) a June 2012 examination showed no tenderness on palpation, no swelling, and no protruding for any type of hernia sac; (4) plaintiff has not received "ongoing treatment for this condition, which suggests that this condition has not caused significant problems"; and (5) no notation in the medical record supports plaintiff's claim that a physician told her she was limited to lifting ten pounds. (Tr. 22).

The medical evidence shows that on April 10, 2012, plaintiff went to the emergency room with a complaint of abdominal pain. (Tr. 408). Dr. Don Duke's physical examination showed that plaintiff was not in acute distress. Her abdomen was "[s]oft, with mild tenderness, with limited guarding noted about the umbilicus and left lower quadrant. Deep palpitation is possible without any evidence of organomegaly or significant guarding." (*Id.*). Dr. Duke ordered a CAT scan of plaintiff's abdomen, which showed "a very small periumbilical hernia with some incarcerated omental fat possibly." (Tr. 409). Dr. Duke noted that plaintiff "seemed to be substantially improved toward the latter part of her emergency department stay after receiving Phenergan and Toradol injection." (*Id.*).

At an April 12, 2012 follow-up exam with Dr. Jeanette Morgan, plaintiff's primary care physician, plaintiff's abdomen was "[s]oft and nontender" with "no guarding or rebound." (Tr. 485). Dr. Morgan noted that plaintiff was "tender to palpation" over an area of firmness in the pelvis that Dr. Morgan thought might be an enlarged uterus. (*Id.*). At an exam on April 23,

2012, Dr. Morgan found that plaintiff's abdomen was "[s]oft with tenderness in the suprapubic lower pelvis area" with "no guarding or rebound." (Tr. 484). In the subjective portion of her treatment note, Dr. Morgan noted plaintiff's claim that she could lift "about five pounds, and after that she has pain from her hernia." (*Id.*).

On June 2, 2012, plaintiff went to the emergency room complaining of cough and diarrhea. (Tr. 400). Dr. Bernard Oppong's examination revealed that her abdomen was "[s]oft [and] nontender" with "no bruit [and] no masses." (*Id.*). On June 17, 2012, plaintiff went to the emergency room complaining of pain from her hernia. (Tr. 386). Dr. Keith Harkins's examination revealed that plaintiff's abdomen was soft, she did not have "significant tenderness on palpation about the umbilicus," and there was no "swelling or protruding for any type of hernia sac." (*Id.*). Dr. Harkins felt "that treatment can be symptomatic." (*Id.*). He prescribed Naprosyn and Ultram. (*Id.*).

At an exam on August 6, 2012, Dr. Morgan noted that plaintiff's abdomen was soft and non-tender with no palpable abdominal masses. (Tr. 473). On August 21, 2012, plaintiff went to the emergency room complaining of arm pain. Dr. Duke's examination revealed that plaintiff's abdomen was soft and non-tender. (Tr. 383). She had no abdominal pain at that time. (*Id.*). At a follow-up appointment with Dr. Morgan on August 30, 2012, plaintiff complained of moderate abdominal pain, but Dr. Morgan's examination revealed that plaintiff's abdomen was soft and non-tender with no palpable abdominal masses. (Tr. 470-71). On November 9, 2012, Dr. Morgan referred plaintiff's complaint of lower abdominal pain to Dr. Craig Forbes, a specialist in obstetrics and gynecology. (Tr. 464).

On November 10, 2012, plaintiff went to the emergency room seeking treatment for a possible yeast infection. (Tr. 379). Dr. Kim Routh's examination revealed that plaintiff was not

in acute distress and that her abdomen was soft with no tenderness. (*Id.*). At a follow-up appointment on November 12, 2012, Dr. Morgan's examination revealed that plaintiff's abdomen was soft and non-tender. (Tr. 460). Plaintiff had no abdominal pain at that time. (*Id.*). Plaintiff's abdomen was soft and non-tender at appointments with Dr. Morgan on January 31 and March 21, 2013. (Tr. 455, 449). Plaintiff complained of abdominal pain at the January 2013 appointment, but had no abdominal pain at the March 2013 appointment. (*Id.*).

Dr. Forbes performed a total hysterectomy on February 8, 2013. (Tr. 327). At that time, plaintiff's abdomen was "[s]oft, mildly obese, and nontender" with "no guarding or rebound except in her lower midabdomen, which is somewhat tender to palpation." (Tr. 324). On February 24, 2013, plaintiff went to the emergency room complaining of postoperative bleeding. (Tr. 362). At that time plaintiff's abdomen was soft and non-tender, and she did not have abdominal pain. (Tr. 318, 359, 362).

Abdominal exams performed by Dr. Hari Perali on March 25 and April 19, 2013 were unremarkable. (Tr. 518-22). At an April 30, 2013 appointment, Dr. Perali's exam revealed "mild, epigastric and [left upper quadrant] abdominal tenderness." (Tr. 515-16). On May 28, 2013, plaintiff went to the emergency room for chest pain. (Tr. 537). Dr. Harkins's exam revealed that plaintiff's abdomen was soft and non-tender. (*Id.*). Plaintiff's medical records do not indicate that any doctor ever noted that her ability to lift was restricted because of abdominal pain associated with her hernia.

Based on these medical records, substantial evidence supports the ALJ's assessment of plaintiff's hernia. Plaintiff bears the burden of producing evidence to establish her RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). Where a claimant fails to obtain a medical assessment on her functional abilities and relies on other evidence to prove her

impairments, the burden of proof does not shift to the Commissioner, but remains with the claimant to prove the extent of the limitations from her impairments. *Id.* Here, plaintiff did not obtain an assessment from any medical source to support her claim that her hernia limited her to lifting no more than ten pounds. Further, plaintiff's hernia was "very small," and her doctors agreed that it could be treated with medication. (Tr. 386, 409). Moreover, substantial evidence supports the ALJ's conclusion that plaintiff did not consistently seek treatment for her hernia. The medical record reveals that plaintiff went to the emergency room for hernia pain in April and June 2012. (*Id.*). Although plaintiff regularly received medical treatment for other problems throughout the remainder of 2012 and the first half of 2013, her abdominal exams were largely unremarkable, and she complained of abdominal pain only at appointments on August 30, 2012, January 31, 2013, and April 30, 2013. (Tr. 455, 470-71, 515-16). Plaintiff did not report abdominal pain at appointments on August 21, 2012, November 10, 2012, November 12, 2012, February 24, 2013, March 21, 2013, March 25, 2013, April 19, 2013, and May 28, 2013. (*See* Tr. 318, 359, 362, 379, 383, 449, 460, 518-22, 537). Based on this medical evidence and the lack of a medical opinion finding that plaintiff's hernia restricted her ability to lift, the ALJ reasonably rejected plaintiff's testimony that she could not lift more than ten pounds. *See Her*, 203 F.3d at 391.

Finally, the undersigned concludes that the ALJ was not required to make an explicit finding at step two as to whether plaintiff's hernia was severe where the ALJ found four other severe impairments. *See Maziarz*, 837 F.2d at 244 (explaining that when ALJ found at least one severe impairment at step two, ALJ's failure to find claimant's cervical condition to be a severe impairment was not reversible error, where ALJ considered claimant's cervical condition in assessing his RFC). *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) ("The

ALJ specifically found that [some of] Anthony's [impairments] . . . qualified as severe impairments. . . . Anthony therefore cleared step two of the sequential analysis. The fact that some of Anthony's impairments were not deemed to be severe at step two is therefore legally irrelevant."). Accordingly, the ALJ's assessment of plaintiff's hernia impairment is supported by substantial evidence.

### 2. Substantial evidence supports the ALJ's assessment of plaintiff's ulnar neuropathy

Plaintiff next argues that because no medical source provided an opinion about the restrictions stemming from plaintiff's ulnar neuropathy, the ALJ improperly relied on his own "medical" opinion in finding that plaintiff was limited to occasional pushing and pulling with the right arm but had no restrictions on reaching, lifting, handling, fingering, or feeling. (Doc. 10 at 10-11). Plaintiff asserts the RFC is "internally inconsistent" because "common sense dictates that she should also be limited to occasional reaching and lifting, since the elbow mechanics associated with pushing and pulling are the same as that required for reaching [and] lifting." (*Id.* at 11). Plaintiff contends that records from her physical therapy sessions support a finding that she has greater limitations in the use of her right arm. (*Id.* at 11-13). Plaintiff argues the ALJ erred in finding that plaintiff does not wear braces or supports because she had been prescribed a right arm brace, which the ALJ noted plaintiff was wearing at the hearing. (*Id.* at 13). Plaintiff further contends the ALJ erred in finding that she had not been referred to a specialist and that surgery had not been recommended because plaintiff was being seen by an orthopedic specialist and that specialist had referred her to an orthopedic surgeon. (*Id.*). Plaintiff asserts that her ability—on a non-daily basis—to shower, dress herself, and cook does not "compel a finding that she could use her right arm and hand consistently over an 8 hour work day." (*Id.* at 14).

11

The Commissioner responds that because plaintiff has not provided any medical opinions to support her claim that her functional limits are greater than those indicated in the ALJ's RFC assessment, she has not met her burden of proving that her ulnar neuropathy limits her functioning. (Doc. 15 at 7). The Commissioner argues that treatment notes from plaintiff's orthopedist contemporaneous to her physical therapy sessions indicated that she has normal strength, flexion, extension, and deviation with no muscular atrophy, erythema, swelling, or pain. (*Id.* at 8). Although plaintiff was wearing a brace at the hearing, the Commissioner contends the ALJ properly considered that at the time of her physical therapy sessions, she did not wear any elbow or wrist support. (*Id.*). The Commissioner argues that although plaintiff's orthopedist referred her to a surgeon, she did not meet her burden of proving additional limitations because she "did not submit any further records indicating treatment from [the surgeon] prior to the ALJ's September 2013 decision." (*Id.* at 9). The Commissioner contends the ALJ properly considered plaintiff's ability to perform daily activities and that plaintiff's performance of those activities on a non-daily basis "was due to her mental condition, not limitations from ulnar neuropathy." (*Id.*).

In assessing the RFC limitations attributable to plaintiff's ulnar neuropathy, the ALJ found that when plaintiff presented to the emergency room on August 21, 2012 complaining of numbness and tingling in her right arm, the medical examination revealed that her arm was sensate and strong with no evidence of weakness. (Tr. 21). The ALJ also noted the following medical evidence: (1) plaintiff had no swelling, deformities, tenderness, erythema, or crepitus in her right elbow on August 31, 2012; (2) an electromyogram in December 2012 showed that her ulnar neuropathy was "mild"; (3) plaintiff had normal strength, flexion, extension, and deviation with no muscular atrophy, erythema, swelling, or pain during examinations on January 8 and

12

February 5, 2013; (4) plaintiff complained of pain and numbness at a physical therapy evaluation on January 21, 2013, but she acknowledged she did not wear an elbow or wrist support, and examination revealed only "very slight" tenderness; and (5) a May 2013 MRI was unremarkable. (Tr. 22). From this medical evidence, the ALJ concluded that plaintiff's ulnar neuropathy was mild and did not necessitate additional limitations in handling, fingering, and fine manipulation. The ALJ noted that plaintiff "has not been referred to a specialist, nor has surgery been recommended." (*Id.*). The ALJ also noted that plaintiff "herself testified she can put on her own shoes and socks, dress herself, shower/bathe herself, and cook." (*Id.*).

The medical evidence shows that on August 21, 2012, plaintiff went to the emergency room with a complaint of discomfort and tingling in her right arm. (Tr. 383). Dr. Duke's physical examination revealed that plaintiff's arms were "sensate and strong" with "[n]o evidence of weakness." (*Id.*). Dr. Duke noted that "despite evidence of apparent ulnar mono neuropathic change," plaintiff "has good sensation over the ulnar distribution of her right upper extremity and upon palpation along the ulnar groove at the elbow." (Tr. 384). Dr. Duke further noted that there was no swelling, discoloration, or tenderness; however, "[t]raction on the nerve at this point, does appear to stimulate or aggravate changes that she describes." (*Id.*). Dr. Duke prescribed Motrin and diagnosed right ulnar neuropraxia. (*Id.*).

At an August 30, 2012 follow-up exam, Dr. Morgan found that plaintiff's right elbow had a full range of motion and no tenderness, pain, deformities, erythema, warmth, or crepitus. (Tr. 471). Dr. Morgan ordered an electromyogram and referred plaintiff to Dr. Aaron Roberts, an orthopedic specialist. (Tr. 461, 467). At his December 4, 2012 examination of plaintiff, Dr. Roberts noted that plaintiff's electromyogram showed mild ulnar neuropathy. (Tr. 308). Dr. Roberts's examination found that plaintiff's right arm had full flexion, supination, pronation,

13

sensation, and strength with no pain, muscular wasting, atrophy, warmth, erythema, or swelling. (Tr. 310). The results of his examination were the same on January 8, 2013. (Tr. 307). The results of Dr. Roberts's February 5, 2013 examination were the same except that he noted plaintiff was positive for pain in her right elbow. (*See* Tr. 305). Dr. Roberts ordered an MRI and referred plaintiff to Dr. Neal Ghany for nerve decompression and possible surgical intervention. (Tr. 304, 306).

Plaintiff's January 21, 2013 physical therapy evaluation revealed that she "does not wear elbow nor wrist support." (Tr. 366). On palpation, plaintiff had "very slight tenderness" in her right elbow. In contrast to strength ratings of 4 in her left elbow and wrist, plaintiff received ratings of 3+ in her right elbow and wrist. (*Id.*). Plaintiff's physical therapist indicated that plaintiff should receive therapy two times a week for six to eight weeks. (Tr. 367). Plaintiff received physical therapy on January 21, January 23, January 29, and February 1, 2013. (Tr. 371-75). After her February 1 therapy session, plaintiff did not schedule additional sessions, stating "she will wait until after her [follow-up] with physician to see if he wants her to continue [physical therapy]." (Tr. 375). A May 31, 2013 MRI of plaintiff's right elbow was unremarkable. (Tr. 535-36). Plaintiff's medical records do not indicate that any doctor or physical therapist ever noted functional limitations associated with her ulnar neuropathy.

Based on these medical records, substantial evidence supports the ALJ's assessment of plaintiff's ulnar neuropathy. As with her hernia, plaintiff did not obtain a functional assessment from any medical source to support her claim that her ulnar neuropathy limited her functional capacity to reach, lift, handle, finger, and feel with her right arm. Thus, plaintiff has not met her burden of proving a more limited RFC. *See Her*, 203 F.3d at 391. Moreover, substantial evidence supports the ALJ's conclusion that plaintiff's ulnar neuropathy did not cause greater

functional limitations than those set forth in the ALJ's RFC assessment. Examining physicians found that plaintiff retained full strength and sensation in her right arm with no swelling, muscle wasting, atrophy, erythema, or warmth. (*See* Tr. 305, 307, 310, 383-84, 471). Plaintiff's electromyogram revealed only "mild" ulnar neuropathy and her MRI was "unremarkable." (Tr. 308, 535-36). Plaintiff's physical therapist found only "very slight tenderness" in plaintiff's right elbow. (Tr. 366). Further, the physical therapist noted that as of January 2013, plaintiff "does not wear elbow nor wrist support." (*Id.*). Plaintiff ceased her physical therapy prematurely in February 2013 after only four sessions, and there is no evidence in the record that she later resumed physical therapy. (*See* Tr. 375). While Dr. Roberts did refer plaintiff to Dr. Ghany for nerve decompression and possible surgical intervention, there is no evidence in the record that plaintiff ever saw Dr. Ghany or underwent surgery. (*See* Tr. 304, 306). Plaintiff's physical therapist found that plaintiff's strength in her right wrist and elbow ("3+") was slightly less than that in her left wrist and elbow ("4"). (Tr. 366). However, plaintiff's therapist did not render an opinion concerning whether plaintiff's strength level in her right arm caused any functional limitations. (*See* Tr. 366-67, 371-75). Based on this medical evidence and the lack of a medical opinion finding that plaintiff's ulnar neuropathy restricted plaintiff's ability to reach, lift, handle, finger, and feel with her right arm, the ALJ reasonably assessed the RFC limitations associated with plaintiff's ulnar neuropathy. *See Her*, 203 F.3d at 391.

### III. Conclusion

Based on the foregoing, the undersigned concludes that substantial evidence supports the ALJ's assessment of plaintiff's hernia and ulnar neuropathy in determining her RFC.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED**.

Date: 12/10/15

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ANGELA UNDERWOOD,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:15-cv-34
Barrett, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).